# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 25, 2011 Session

## FRED RATLIFF, JR. v. STATE OF TENNESSEE.

**Appeal from the Circuit Court for Scott County**
**No. 4861     E. Shayne Sexton, Judge**

---

**No. E2011-01187-CCA-R3-PC - Filed May 23, 2012**

---

In February 2011, the Petitioner, Fred Ratliff, Jr., filed a petition for writ of error coram nobis, wherein he challenged his 1976 conviction for first degree murder. The Petitioner claimed that he had "compelling" new evidence of his innocence because the State failed to disclose a key prosecution witness's juvenile record in violation of Brady v. Maryland, 373 U.S. 83 (1963). After an evidentiary hearing, the coram nobis court first dismissed the petition as time-barred, finding that due process did not require tolling of the one-year statute of limitations. Then, addressing the merits of the Petitioner's Brady claim, the coram nobis court concluded that the Petitioner had not shown that the new evidence may have resulted in a different judgment had it been presented at trial. Following our review of the record, we affirm the judgment of the Scott County Circuit Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JERRY L. SMITH, J., not participating.

Drew Justice, Franklin, Tennessee, for the appellant, Fred Ratliff, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; William Paul Phillips, District Attorney General; and John W. Galloway, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

In August 1976, the Petitioner was tried jointly with his parents and brother, Theadore, for the first degree murder of their elderly, 81-year-old neighbor Hattie Mullins Sexton (the victim). The victim was shot once in the head, killing her, and her body was

discovered in the burned rubble of her home on January 10, 1976. The trial court directed a verdict for the Petitioner's father, and the jury acquitted the Petitioner's mother; both the Petitioner and his brother were found guilty as charged and sentenced to life in prison. On direct appeal, this court summarized the facts established at trial as follows:

> All of the proof was circumstantial. The prosecution's theory of the motive for the murder was based on the fact that the victim was the prosecutorix and only eyewitness to a charge against Theadore Ratliff for the burglary of her home. The victim had identified Theadore Ratliff as the burglar in judicial proceedings prior to her death.

> The cause of death was established by a pathologist who performed a complete autopsy of the victim. The pathologist concluded from the fact the victim had no soot or dirt in her lungs that she had expired from a single gunshot wound to her head prior to being burned.

> The proof which linked the appellants to the crime is as follows. An empty shell casing was found in the rubble of the victim's home, which expert testimony established had been fired from a .38 caliber automatic pistol as having been in the exclusive possession of the appellants' family. Three witnesses testified that the defendants had threatened to harm the victim prior to her death. A gas can similar to one found at the Ratliff dwelling was found next to the burning house, although similar cans were available at retail establishments in the area. One witness testified that the appellants' father had told him that the family had two of the same type cans, but they could only find one when they went to find them. The gas can found at the fire also had a "particular odor."

> A neighbor of the victim testified that before the fire her dogs were "carrying on." She first heard a noise like "somebody rattlin' you know; movin' his feet in the grass." She then saw a slim man wearing light gray looking clothes, with a broad band or belt around his waist, going from the direction of the Ratliff's home toward the victim's house. Exhibits of blue denim jeans and jackets of the appellants and a wide belt taken during the search of the Ratliff home were introduced at trial. Testimony also established that the slender appellants wore this clothing on the night of the fire. After she saw this person she heard a racket which sounded "a little bit like the crack of a gun." She then looked toward the victim's home and saw black smoke.

An expert in blood identification found human blood on the denim clothing exhibited at the trial. However, this witness was unable to say that the stains were from the victim's blood. Both the defendants and their father testified that Freddy Ratliff, Jr. had been cut one day when they were chopping trees, and suggested that this accounted for the stains.

Perhaps the most damaging testimony was by a witness who accompanied Theadore Ratliff to a "holler" on the Sunday morning after the victim's death to drink some beer and talk. During the conversation the witness asked Ratliff about his neighbor's death, and the defendant noted that she was "shot and burned." The witness asked, "what do you mean, was she shot?" The defendant then said he was talking about someone else they had been talking about earlier. The gunshot wound to the victim was not discovered until the autopsy on that same Sunday. The local sheriff was not notified of the discovery of the bullet wound until that afternoon and the information was not passed to the public at that time.

The appellants testified and denied making threatening statements about the victim. Their family testified they remained at home throughout the evening of the fire. The presence of Freddy Ratliff, Jr. was also confirmed by his girlfriend who was talking with him on the phone around the time the fire began.

Theadore Ratliff and Fredrick Ratliff, Jr. v. State, No. 25, slip op. at 1-3 (Tenn. Crim. App. Aug. 3, 1977), cert. denied, (Tenn. Oct. 17, 1977). Two months later, our supreme court denied the petition for certiorari.

Although not specifically recounted in the statement of facts provided by this court in the direct appeal opinion, our review of the trial record reveals that Darrell Bowling was the main witness who connected the Petitioner to the murder, testifying that the Petitioner had threatened to rob and murder the victim. Mr. Bowling was arrested with the Petitioner and his brother on an unrelated burglary charge several days after the victim's murder. Although the sheriff testified that he gave Mr. Bowling permission to participate in the unrelated burglary to trap the Petitioner and his brother, Mr. Bowling was still arrested for the crime. While in custody on the charge, Mr. Bowling further incriminated the Petitioner in the murder and thereafter made bail. No charges were ever filed against Mr. Bowling for his participation in the unrelated burglary with the Petitioner and his brother. Mr. Bowling testified at trial that he did not receive any promises in exchange for his accusations against the Petitioner.

At trial, Mr. Bowling initially testified that the Petitioner had talked about robbing and killing the victim on two occasions, but he could not remember the exact words used. After he was recalled to the stand the next day, Mr. Bowling stated that the Petitioner had actually mentioned robbing and killing the victim "[j]ust about every day" during the ten days leading up to the murder. He claimed that he did not relay this information in his previous testimony because he was not asked.

Mr. Bowling was also asked about his criminal history. Defense counsel inquired if there were "any other cases" besides the burglary that the sheriff "had against" him, and Mr. Bowling replied, "No, sure didn't." Defense counsel then asked Mr. Bowling if he had been convicted of a felony, and he said, "Not as I know of." The State objected to the question, and the trial court sustained the objection unless defense counsel knew of something specific to ask about. Defense counsel then asked Mr. Bowling, "Are you under probation right now?" Mr. Bowling responded, "No, I ain't." Sheriff Julius Lewallen was asked if he had worked with Mr. Bowling before, to which he gave the following response:

> Well, . . . it's hard to . . . say, I have arrested Darrell on numerous occasions like for not going to school, and . . . I think he answered he was convicted of a felony. As I recall, he was not convicted of a felony. He would not attend school, and we had to arrest him for that, and I'm sure he's told me things, but you know . . . nothing that I can recall. He's always been cooperative, but I don't recall any specific thing where he has give[n] me that type of information before.

During his testimony, Mr. Bowling claimed he was in Georgia at the time the victim was murdered. Thereafter, a witness from the audience came forward and testified that he had seen Mr. Bowling on the evening of the murder near the crime scene inquiring about whose house was burning. Mr. Bowling's wife, father, and in-laws then testified, verifying that Mr. Bowling had in fact visited Georgia.

In closing argument, the prosecutor said that State's witnesses Darrell Bowling, Buster Gibson, and Danny Slaven, as friends of the Petitioner, lacked any motivation to falsely accuse the Petitioner. In speaking to the credibility of these witnesses, the prosecutor stated the following:

> There is some people, and most people who just will not do those kinds of things. . . . Darrell Bowling wouldn't go ahead and do [the burglary] till the Sheriff told him to go on up there with him, he would be sitting there waiting for him. You see, some people turn it off; but they told on these Defendants.

-4-

The State then focused on the allegation that Darrell Bowling committed perjury. The prosecutor proclaimed the importance of bringing "all the evidence that we have" (i.e., having the witnesses come all the way from Georgia) to refute the suggestion of perjury.

Ten years after our supreme court denied the Petitioner's certiorari petition, he filed his first petition for post-conviction relief (Scott County Case No. 53) on November 4, 1987. In the 102-page pro so petition, he made numerous allegations of ineffective assistance of counsel. He addressed, among other things, Darrell Bowling's motivation to assist law enforcement by implicating the Petitioner in an effort to avoid prosecution for charges of burglary (the one he was arrested for just days following the murder) and drunkenness.

We glean from the record that a hearing was conducted on this petition, relief was denied, and no appeal was taken. However, only the post-conviction petition and pro se supplements and amendments thereto are included in the appellate record. Neither the "technical record" of this post-conviction case nor a transcript of the hearing on the petition were entered as exhibits at the coram nobis hearing. According to the motion to dismiss the coram nobis petition filed by the State, the post-conviction court withheld its decision on the post-conviction petition in order to permit the Petitioner time to supplement the record with the testimony of Mr. Bowling. The State continued that ultimately, the Petitioner was unable to locate Mr. Bowling, so the post-conviction court denied relief by order dated August 1, 1989. Nevertheless, "[a]llegations contained in pleadings are not evidence." See State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

The Petitioner filed a second pro se petition for post-conviction relief (Scott County Case No. 7226) in November 1996. In this petition, the Petitioner raised as a ground for relief that trial counsel failed to "investigate or interview witnesses thoroughly." The Petitioner specifically challenged the investigation of Darrell Bowling:

> Counsel did not inform [P]etitioner of this individual's statements made to the authorities or of the substance of the testimony he would give at trial. Counsel did not investigate this or any aspect of this individual's background; a background that included a criminal record and obvious cooperation with the police in the allegations against the [P]etitioner. This individual, it is now known, initiated a scheme with local authorities to include [P]etitioner in a burglary with him, in which the authorities would arrest all parties after the burglary was in progress.
>
> Darrell Bowling then informed the authorities that [P]etitioner had asked him to assist him in the robbery and murder for which [P]etitioner stands convicted. The entire story presented to the authorities by this individual is a

fabrication, given in exchange for all charges being dismissed on this individual. Petitioner's Counsel did not pursue an obvious needed investigation of this individual nor an investigation of his past criminal record or of his dealings with local authorities. Had he done so, the outcome of the proceedings would have been different.

By written order, this second petition was dismissed due to principles of res judicata, "[t]he issues raised were all previously determined in the appeal of the original case and the subsequent petition for post-conviction relief, Scott County case #53," and because the petition was barred by the statute of limitations.

Then, in April 2005, the Petitioner filed a petition pursuant to the Post-Conviction DNA Analysis Act of 2001 seeking testing of the clothing presented to the jury. The petition was dismissed because the evidence could not be located.

On February 22, 2011, the Petitioner filed the petition for writ of error coram nobis that is the subject of the appeal herein. In the petition, the Petitioner claimed, as newly discovered evidence, that the State, in violation of Brady v. Maryland, 373 U.S. 83 (1963), withheld "exculpatory material from the juvenile record" of Darrell Bowling, the primary witness against him, despite defense counsel's request for such records. The Petitioner alleged that in March 2010, his current counsel visited Mr. Bowling in prison and obtained permission to view Mr. Bowling's juvenile record. After viewing Mr. Bowling's juvenile record, counsel discovered that Mr. Bowling had been adjudicated delinquent on January 16, 1973, when he was fourteen years old, for "aiding and abetting in breaking and entering and robbery on January 9, 1973"[1]; that Mr. Bowling was on probation for said robbery in January 1976 when he assisted law enforcement in apprehending the Petitioner; and that Sheriff Julius Lewallen, a prosecution witness, had taken a written confession from Mr. Bowling about the January 1973 robbery. Thus, according to the Petitioner, Mr. Bowling was untruthful at trial in his answers to the following questions: (1) when he was asked if he had been convicted of a felony and responded, "Not as I know of"; (2) when he was asked if he had other cases pending against him and responded, "No, sure didn't"; and (3) when he was asked if he was receiving anything in exchange for his testimony against the Petitioner and responded in the negative. Moreover, the Petitioner noted that these fallacies were compounded by the State's closing argument wherein the prosecutor specifically denied that Mr. Bowling had committed perjury, argued that he lacked any motive to lie, and claimed that he was not the "type of person" to commit serious crimes.

---

[1] The Petitioner refers to this adjudication as a burglary throughout his pleadings. However, we will refer to it as a robbery for purposes of this opinion.

The Petitioner acknowledged that the petition for writ of error coram nobis was untimely but argued that due process necessitated tolling of the limitations period because the interests of the Petitioner outweighed the interests of the State. The Petitioner argued that the impeachment evidence against Mr. Bowling was both exculpatory and material in that a reasonable probability existed that, had the evidence been disclosed, the result of the trial would have been different. The Petitioner sought a new trial.

The State filed a motion to dismiss the coram nobis petition on grounds (1) that it was filed outside of the limitations period; (2) that due process did not require tolling; (3) that the Petitioner was not without fault in failing to present the evidence at the proper time; and (4) that the Petitioner had not shown that the evidence, if presented at trial, might have resulted in a different judgment. The State relied on the following bases to support its conclusions: (1) the law at the time of the Petitioner's trial did not permit cross-examination of witnesses about juvenile adjudications for felonies and crimes of dishonesty to generally attack their character; (2) trial counsel was on notice prior to and certainly during trial that there might have been exculpatory impeachable information in Mr. Bowling's juvenile record and either knew or could have discovered this information with reasonable diligence; (3) there was no Brady violation for prosecutorial misconduct for failing to correct the allegedly false testimony of Mr. Bowling; and (4) trial counsel never specially requested Mr. Bowling's juvenile record.

The Petitioner replied to the motion to dismiss. First, he responded that the sheriff's testimony did not confer on trial counsel any new obligation to make a renewed or more expansive search for Mr. Bowling's juvenile record. Second, the Petitioner argued that the juvenile record was admissible under 1976 law, noting that our supreme court had recently adopted Federal Rules of Evidence 608 and 609; that there was no restriction on use of juvenile records to impeach witnesses; and nonetheless, that the record would have been admissible under the Confrontation Clause to show bias.

A hearing on the petition was held on May 20, 2011. The Petitioner introduced Darrell Bowling's juvenile record, Danny Slaven's juvenile record,[2] a partial trial transcript, the "technical record" from the trial proceedings, the direct appeal opinion, and some of the records from the post-conviction proceedings as exhibits to the hearing. In addition to the information cited by the Petitioner, Mr. Bowling's record reflects that, having turned eighteen years of age, he was released from the custody of the Department of Correction on July 15, 1976, just a month prior to the Petitioner's trial. The Petitioner, trial counsel, and the original prosecutor testified at the coram nobis hearing.

---

[2] Trial counsel testified that he asked Mr. Slaven at trial if he had ever appeared in juvenile court, that the State objected, and that the objection was sustained.

The Petitioner testified that he was unaware of Mr. Bowling's prior conviction for aiding and abetting breaking and entering and robbery. He learned of Mr. Bowling's prior conviction from his current counsel in April 2010. This conviction was never specifically mentioned in any of his prior post-conviction proceedings. However, the Petitioner admitted that he knew that Mr. Bowling was on probation at his trial, becoming aware of this information when they were arrested for the unrelated burglary occurring several days after the murder. The Petitioner agreed that he challenged trial counsel's effectiveness in both of his post-conviction petitions, alleging that trial counsel failed to "attack the record and bring out the record of Darrell Bowling[.]"

Arzo Carson the chief prosecutor against the Petitioner at trial testified about his discovery practices in 1976. He testified that it was not his customary practice to include juvenile records in his case files. He believed that the law at the time of the Petitioner's trial prohibited him from using a delinquent adjudication to impeach a witness, even for crimes of dishonesty, noting that juveniles were only adjudicated delinquent and not convicted of crimes. He stated that he would not use false evidence to convict a defendant or give a false closing argument.

Trial counsel for the Petitioner testified that he filed a discovery request, seeking from the district attorney general a "[c]opy of the criminal records that may be compiled by your office" and "the names and addresses of any person that might help to show the innocense [sic] of the Ratliffs, or any of them, that your office is aware of, and any evidence that might show the innocense [sic] of the Ratliffs that your office has come across during its investigation." He stated that his general practice "[b]ack then" was to ask a critical witness if he or she had been convicted of a felony, regardless of whether he had specific knowledge of such. Trial counsel did not recall knowing that Mr. Bowling had been convicted of a prior robbery or that Mr. Bowling was on probation at the time of his arrest for the burglary with the Ratliffs. He did not see Mr. Bowling's full juvenile record until it was sent to him by the Petitioner's current counsel.

On cross-examination, trial counsel acknowledged that the discovery request did not specifically reference juvenile records or anything else related to Darrell Bowling. Trial counsel testified that he was aware that Mr. Bowling was arrested with the Petitioner and his brother for an unrelated burglary just a few days after the victim's murder, that there was some question whether Mr. Bowling made a deal with the sheriff on this unrelated burglary charge, and that he went into "great detail about this during the trial[.]" Trial counsel averred that, in order to obtain the juvenile records on his own, he would have had to petition the court for the confidential records.

After the conclusion of proof and the arguments of counsel, the coram nobis court first dismissed the petition as untimely, finding that tolling was not required. The court then went on to deny relief on the merits because the Petitioner had failed to allege newly discovered evidence that might have resulted in a different verdict at trial. The case is now before this court for our review.

ANALYSIS

On appeal, the Petitioner alleges that the State violated his constitutional rights under Brady v. Maryland by failing to provide Darrell Bowling's juvenile record, entitling him to coram nobis relief. A writ of error coram nobis is available to a defendant in a criminal prosecution. Tennessee Code Annotated section 40-26-105 provides, in pertinent part, as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b).

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). "The purpose of this remedy is to bring to the attention of the court some fact unknown to the court which if known would have resulted in a different judgment." Freshwater v. State, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (quoting State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995)). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; State v. Harris, 301 S.W.3d 141, 144 (Tenn. 2010) (hereinafter "Harris II") (citing State v. Vasques, 221 S.W.3d 514, 527-28 (Tenn. 2007)).

To establish that he is entitled to a new trial, the Petitioner must show the following: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to

present the newly discovered evidence at the appropriate time; and (d) the relief sought. Hart, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition or at some point in time prior to the hearing. Id. at 375.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

Harris v. State, 102 S.W.3d 587, 592-93 (Tenn. 2003) (hereinafter "Harris I"). To be successful on a petition for a writ of error coram nobis, our supreme court held that "the standard to be applied is whether the new evidence, if presented to the jury, may have resulted in a different outcome . . . ." Vasques, 221 S.W.3d at 526.

The statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court. Tenn. Code Ann. §§ 27-7-103, 40-26-105; Harris II, 301 S.W.3d at 144; Mixon, 983 S.W.2d at 671. The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion. Harris II, 301 S.W.3d at 144 (citing Mixon, 983 S.W.2d at 670). Whether a claim is barred by an applicable statute of limitations is a question of law, which we review de novo. Id. (citing Brown v. Erachem Comilog, Inc., 231 S.W.3d 918, 921 (Tenn. 2007)). We construe the coram nobis statute of limitations consistently with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim. Id. (citing Mixon, 983 S.W.2d at 670). The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. Id. (citing Harris I, 102 S.W.3d at 593).

The one-year statute of limitations may be tolled only when necessary so as not to offend due process requirements. Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001). The Freshwater case is instructional on whether the statute of limitations should be tolled in a particular case:

> In State v.Workman, 41 S.W.3d 100 (Tenn. 2001), the supreme court found that, in a variety of contexts, due process may require tolling of an applicable statute of limitations. Id. at 103. The Workman court relied, in

-10-

part, on the due process considerations discussed in Burford v. State, 845 S.W.2d 204 (Tenn. 1992). Workman, 41 S.W.3d at 102. Specifically, the Burford court recognized that "before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner" and that, "under the circumstances of a particular case, application of the statute may not afford a reasonable opportunity to have the claimed issue heard and decided." Id. (quoting Burford, 845 S.W.2d at 208).

In determining what sort of opportunity is "reasonable," the court concluded that "identification of the precise dictates of due process requires consideration of both the governmental interests involved and the private interests affected by the official action . . . ." Workman, 41 S.W.3d at 102. In Burford, the private interest at stake was the accused's opportunity to attack his conviction and incarceration on the grounds that he was deprived of a constitutional right via a post-conviction petition; the governmental interest represented by the statute of limitations was the prevention of stale and groundless claims. Id. The court in Burford determined, after weighing the competing interests in that case, that the accused's interest in mounting a constitutional attack upon his conviction and incarceration outweighed the State's interest in preventing the litigation of stale and groundless claims.

Using that same analysis, the court in Workman weighed the governmental interests involved against the private interests affected by the official action and decided that, if the procedural time bar was applied, Workman could have been put to death without receiving an opportunity to have the merits of his claim evaluated by a court of this state. Id. at 103. In other words, the court determined that due process precludes application of the statute of limitations to bar consideration of a petition for writ of error coram nobis in cases where the defendant's interest in obtaining a hearing to present newly discovered evidence, which may establish actual innocence, far outweighs any governmental interest in preventing the litigation of stale claims. Id. The supreme court concluded that Workman was entitled to a hearing to evaluate the claims contained in his petition for writ of error coram nobis, notwithstanding the fact that he filed his petition thirteen months after discovering the newly discovered evidence. Id. In considering the delay, the court remarked that the time within which Workman's petition was filed did not exceed the reasonable opportunity afforded by due process, especially in

-11-

cases such as Workman's where the evidence in issue may show actual innocence of a capital offense. Id. at 103-04.

Freshwater, 160 S.W.3d at 556-57. This court has also applied the doctrine set forth in Workman to non-capital cases. See Freshwater, 160 S.W.3d at 557 (sentence of ninety-nine years); State v. Ratliff, 71 S.W.3d 291, 296-97 (Tenn. Crim. App. 2001) (sentence of twenty-four years without parole). The life sentence in this case is a sufficiently significant period of time to warrant a due process analysis.

To determine whether due process requires tolling, a court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims. Workman, 41 S.W.3d at 103. In balancing these interests, a court should utilize a three-step analysis:

> (1) determine when the limitations period would normally have begun to run;
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Harris II, 301 S.W.3d at 145 (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)). The issue of whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness. Id. (citing Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006)).

The State appropriately raised the statute of limitations in the coram nobis court. Based on the record, it is clear that the petition for writ of error coram nobis was filed many years after the statute of limitations had expired. The record shows that the Petitioner was convicted by a jury in August 1976 and that the trial court overruled his motion for new trial on October 14, 1976. The limitations period normally would have began to run thirty days after the motion for new trial order was entered. Moreover, the Petitioner's direct appeal was complete when this court affirmed the convictions on August 3, 1977, and our supreme court denied his petition for certiorari on October 17, 1977. Therefore, the statute of limitations would have expired well over thirty years before the Petitioner filed his petition for writ of error coram nobis in February 2011. The parties do not dispute that the statute of limitations, if not tolled, expired many years before the filing of the instant petition.

After an evidentiary hearing, the coram nobis court ruled that the petition was time-barred because due process did not require tolling of the one-year limitations period. On

appeal, the Petitioner maintains that this ruling was in error because he has newly discovered evidence of his innocence, i.e., Darrell Bowling's juvenile record of a felony conviction, that was not available at the time of trial. He notes the following facts as relevant to the tolling analysis: (1) he was only able to locate the record after getting permission from Darrell Bowling and the juvenile court in April 2010; (2) the State withheld this exculpatory evidence, a confidential juvenile record, and the prosecutor had a vicarious duty to turn over the record, especially as other government officers working on the case (including police) knew it existed; and (3) the sheriff actively misled the court about the contents of Darrell Bowling's juvenile record.

The State responds that because the Petitioner could have raised this claim more than fourteen years ago in his post-conviction petition, his excessive delay in seeking relief is unreasonable as a matter of law, and the coram nobis court correctly declined to toll the statute of limitations. The State submits that the evidence the Petitioner is citing as "newly discovered" was available at least as early as 1996, and the Petitioner had sufficient prior notice of the evidence at issue to assert his claim at an earlier time. The State submits that the Petitioner's prior knowledge of the evidence at issue is reflected by the fact that the Petitioner knew Mr. Bowling was on probation at the time of trial and by his acknowledgment that his prior post-conviction petitions challenged trial counsel's failure to "attack the record and bring out the record of Darrell Bowling."

The coram nobis court made the following findings in ruling on the statute of limitations issue:

> There is no question the [P]etitioner based on his testimony, and that's not been refuted, received actual notice of this prior conviction of Darrell Bowling back in April of last year. The question then becomes was there some sort of constructive notice on behalf of the [Petitioner] or counsel that any -- the respective counsels that he's had over a period of time and based on what I have heard here today, there was ample information available for the [Petitioner], for each -- for trial counsel, for post-conviction counsel, and those issues could have been raised at that time. That is -- that is very important in the analysis in this case. As we said earlier, we can always revisit these constitutional deprivations but at some point, there has to be finality. There has to be enough done at the time that we're doing it to allow courts to correct those types of -- these types of potential errors.
>
> In reviewing the standard -- . . . the filing of this Writ -- or the petition is certainly appropriate, but there has been no evidence submitted here today that would suggest that a tolling of the statute of limitations is appropriate. As

I said earlier, there are -- the testimony is clear that the information was there before the [Petitioner] and trial counsel, the trial counsel was somewhat ambiguous about his basis for asking that question, have you been convicted, but it was asked, the answer was given. I do understand the [P]etitioner's concern that the possible exploration of perjury, whether or not Bowling perjured himself at the time of the trial, and there is a compelling showing by the [P]etitioner that there may have been a lot of embellishing and lying going on and that that -- some of these things might have -- might have surfaced, but there's not -- there is simply not enough at this particular point to suggest a Writ of Error should be issued based on the statute of limitations.

We agree with the coram nobis court that there is no basis for overcoming the State's assertion of the statute of limitations. The Petitioner has had a reasonable opportunity to present this claim at an earlier time. The Petitioner learned that Mr. Bowling was on probation when they were arrested together a few days after the murder. He raised the issue of trial counsel's investigation of Darrell Bowling in both of his post-conviction petitions.[3] Just because the exact details of Mr. Bowling's record did not come to light until 2010 does not mean that the Petitioner has been denied the opportunity for presentation of this claim at a meaningful time and place.[4] The petition is time-barred.

Despite declining to toll the statute of limitations, the coram nobis court addressed the merits of the Petitioner's claim and concluded that the Petitioner failed to present new evidence, which if presented to the jury, may have resulted in a different judgment.[5] The Petitioner alleges that the coram nobis court abused its discretion because it erroneously concluded that the newly discovered evidence would not have affected the verdict. First, he contends that a critical State witness, Darrell Bowling, the only witness who linked the Petitioner to the crime, had a confidential juvenile record for robbery that the State failed to turn over to the defense despite discovery requests. Second, he contends that another

---

[3] Any argument that the issue was not actually ruled upon in the first post-conviction proceeding is waived because the Petitioner has failed to include the pertinent records (i.e., the "technical record" and hearing transcript) from that proceeding in this appellate record. It is an appellant's duty to provide a complete record on appeal. State v. Ballard, 855 S.W.557, 560-61 (Tenn. 1993).

[4] At this juncture, we feel compelled to note that a post-conviction petitioner is not entitled to the effective assistance of counsel. Grindstaff v. State, 297 S.W.3d 208, 219 (Tenn. 2009) (citing House v. State, 911 S.W.2d 705, 712 (Tenn. 1995); State v. Garrard, 693 S.W.2d 921, 922 (Tenn. Crim. App. 1985)).

[5] In the interest of justice and in the event of further review, we will also examine the Petitioner's claim on the merits. See Arthur L. Armstrong v. State, No. M2008-02328-CCA-R3-CO, 2010 WL 2977890, at *12 (Tenn. Crim. App. July 30, 2010), perm. app. denied, (Tenn. Jan. 18, 2011).

prosecution witness, the sheriff, lied on the stand regarding Mr. Bowling's criminal record. Trial counsel could not impeach the statement by the sheriff that Mr. Bowling was a "cooperative" kid whose only real legal problems involved skipping school. Finally, the Petitioner contends that Federal Rules of Evidence 608 and 609 or the Confrontation Clause would have compelled admission of the witness's juvenile record.

The State responds that the coram nobis court did not abuse its discretion in declining to grant relief based on evidence that formed the basis of earlier post-conviction proceedings. According to the State, because the impeachment value of Mr. Bowling's criminal record was a matter litigated during earlier post-conviction proceedings, the Petitioner has no right to coram nobis relief based on that same evidence or issue.

A petition for a writ of error coram nobis may be an appropriate remedy by which to seek relief from constitutional errors such as that asserted under Brady v. Maryland. Freshwater, 160 S.W.3d at 555-56. Under Brady v. Maryland, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady, 373 U.S. at 87. Evidence that is favorable to an accused includes proof which may be used to impeach the prosecution's witnesses. State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998) (citing Giglio v. United States, 405 U.S. 150 (1972)). However, "the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).

Thus, a criminal defendant must satisfy the following four prerequisites in order to demonstrate a due process violation under Brady v. Maryland:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2. The State must have suppressed the information;
> 3. The information must have been favorable to the accused; and
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant has the burden of proving a Brady violation by a preponderance of the evidence. Id. "The key to proving a constitutional violation is to show that the omission is of such significance as to deny the defendant the right to a fair trial." Id.

Turning to the Brady claim, the coram nobis court ruled as follows:

> The substance of these claims in the [c]ourt's opinion is a tough road to hoe. There are lots of supposition which we can all do and we will forever do, but there is just simply not enough showing to this [c]ourt that the -- any new evidence may or -- may affect the outcome in this trial of what happened before.

We cannot conclude the coram nobis court abused its discretion in determining that the new evidence was not material, i.e., that the Petitioner failed to establish a reasonable probability that the result of his trial might have been different if this information had been disclosed. Darrell Bowling's cooperation with police following his arrest and his possible motivations for giving testimony against the Petitioner were thoroughly explored at trial. The sheriff testified at trial that he gave Mr. Bowling permission to participate in the subsequent burglary to trap the Petitioner and his brother; the jury was aware that no charges were ever filed against Mr. Bowling for his participation in that unrelated burglary. While the sheriff did state that Mr. Bowling had not been convicted of a felony, he also relayed that he had arrested Mr. Bowling on numerous occasions. The defense extensively challenged Mr. Bowling's credibility at trial, even suggesting that he may have been involved in the murder as an eyewitness placed Mr. Bowling at the scene. We conclude that the coram nobis court did not abuse its discretion by denying relief.

## CONCLUSION

Based on our review of the record, the parties' briefs, and the applicable law, we conclude that dismissal of the petition for writ of error coram nobis as time-barred was proper and that denial of the Brady claim was not an abuse of discretion. Accordingly, we affirm the judgment of the coram nobis court.

_____
D. KELLY THOMAS, JR., JUDGE

-16-